People v Rodriguez (2018 NY Slip Op 00040)





People v Rodriguez


2018 NY Slip Op 00040


Decided on January 2, 2018


Appellate Division, First Department


Webber, J, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 2, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rosalyn H. Richter,J.P.
Troy K. Webber
Cynthia S. Kern
Peter H. Moulton,JJ.


3998/13 4828 

[*1]The People of the State of New York, Respondent,
v
Lorenzo Rodriguez, Defendant-Appellant.



Defendant appeals the judgment of the Supreme Court, New York County (Maxwell Wiley, J.), rendered December 18, 2014, convicting defendant, after a jury trial, of burglary in the second degree, and imposing sentence.




Robert S. Dean, Center for Appellate Litigation, New York (Matthew Bova of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Hope Korenstein and Alan Gadlin of counsel), for respondent.



WEBBER, J.


On August 28, 2013, at approximately 9:10 p.m., complainant Lopez returned to her top floor, one bedroom apartment in upper Manhattan, which she shared with her husband and two other individuals. When Lopez entered her bedroom, she encountered a stranger, later identified as defendant, standing near the bedroom window. Lopez screamed to her husband that someone was in the apartment. Defendant retreated out the window and up the fire escape ladder. Lopez then noticed that her iPad was missing from her bedroom table and her piggy bank was missing from where she had left it near the bedroom window.
At the same time, Police Officer Orlando Corchado and his partner, Officer Lassen, were on the roof of the building, performing a vertical patrol, checking every floor and then ascending to the roof [FN1]. Corchado was about 6 to 10 feet from the fire escape when he saw defendant climb up the fire escape ladder toward the roof. Defendant was wearing latex gloves and was carrying [*2]a white piggy bank in his left hand. Corchado asked defendant in English why he was there. Defendant answered in Spanish that he worked for the super. Ignoring Corchado's further request that he stop, defendant climbed back down the ladder.
Defendant reappeared at Lopez's window, climbed into the bedroom, and moved through the bedroom toward the apartment's outer door. Along the way, he handed the piggy bank to Lopez's husband and said, "I'm sorry, here's your piggy bank." Moments later, Corchado and Lassen followed defendant through the window into the Lopez apartment. Corchado asked Lopez if she knew defendant and if he worked for the super. Lopez replied that defendant "was a thief." As Corchado proceeded after defendant, he saw him — who was in the hallway of the apartment — reach behind his back and remove an iPad mini that was stuffed in the back waistband of his jeans. Defendant appeared about to discard the iPad when one of the residents of the apartment grabbed it from him. Defendant was placed under arrest by Corchado. Police Officer Lassen searched defendant and recovered from his pockets two flashlights, an iPad charger, a cell phone and latex gloves. Defendant was transported to the hospital and then to the precinct. While in a holding cell at the precinct, and before the administration of his Miranda rights, defendant stated that he was visiting his girlfriend who resided on the 4th floor of the building, and climbed up the fire escape so as to avoid being discovered by her husband.
Virtually from the beginning of the prosecution, defendant filed numerous pro se motions, all before the trial court. Defendant filed cross grand jury notice indicating his desire to testify before the grand jury. He then filed a motion to dismiss the indictment based upon the legal insufficiency of the evidence before the grand jury, specifically his failure and the failure of his girlfriend to testify before the grand jury. Defendant also filed two motions for reassignment of counsel, both of which were granted. Defendant later filed a motion for a reduction in bail and a motion to dismiss the indictment on speedy trial grounds.
On May 8, 2014, shortly prior to the commencement of the suppression hearings, and represented by his third court-appointed attorney, defendant moved to proceed pro se. He informed the court that he wished to represent himself because "all of" his attorneys had "lied" to him.
In response to the court's inquiry, defendant stated that he had never before represented himself; that he had been represented by counsel in a trial that occurred 13 years earlier; that the highest level of education he had completed was the "[f]ourth grade of elementary school"; that he could not "read any English at all," and would require an interpreter to help him read the documents in the case.
The court stated to defendant that representing oneself at trial was "a very, very bad idea" — which the court compared to "a doctor treating himself for his own illness" — and stated that it was "better" for defendant to allow "a trained person who is not personally involved in the case" to "look at the evidence." The court stated that defendant may "allow emotion and [his] lack of legal training to lead [him] to make some bad determinations at trial." While acknowledging that defendant had the right to choose to represent himself, the court stated "it's a bad decision."
The court also stated that if defendant chose to proceed pro se, he would be required to select a jury which involved knowing the rules of the court as well as the number of applicable challenges; decide whether to deliver an opening statement; question the People's witnesses; and decide without advice from anyone whether he would testify on his own behalf. The court informed defendant that neither the court nor the prosecution could provide him with legal advice. The court also suggested that defendant's effectiveness might be hampered because he would have to communicate with the jury through an interpreter. Finally, the court informed defendant that he would be required to abide by the court's rulings, just as any lawyer would, and would not be permitted to "talk out of turn" or "interrupt the court." Defendant assured the court that he understood all requirements.
At the next court appearance, on May 13, 2014, counsel stated that he had spoken with defendant the previous day, and that defendant had given counsel permission to sit at counsel table and advise him. The court acquiesced and commenced the suppression hearing. On cross-examination of the People's first witness, the arresting officer, the court sustained the People's objection to defendant's very first question. Defendant then announced that he was "not going to continue here," and started to leave the courtroom. The court stated that while defendant was free to leave, the hearings and trial would continue without him. Defendant asserted that the court could not continue without him because "I'm my own attorney."
After further consultation with counsel, counsel informed the court that defendant had asked him to continue the hearing. Defendant stated that he would let counsel represent him, but that if he "[saw] that things are going wrong" he would not come back to court. The court reiterated that if he refused to return, they would proceed in his absence.
On the next day of the proceedings, on May 15, 2014, counsel reported that defendant again stated to him that he wanted to represent himself, and that he did not want counsel present. The court again acceded to defendant's request to proceed on his own, however, directed counsel to remain. Defendant argued the suppression motion, contending that he had not been read his Miranda rights and therefore the statement should be suppressed. The court denied the suppression motion.[FN2]
The court then commenced the Sandoval hearing. The court first explained the procedure to defendant and then asked the People which prior convictions they sought to question defendant about should he testify. The People argued that they wanted to question defendant about two 1999 felonies— one for robbery in the second degree and the other for grand larceny in the third degree. The People stated that they wished to question defendant as to the underlying facts of each conviction, and elicit that defendant was currently on parole as a result of the felony conviction. The People also stated that they wished to question defendant about a 2010 misdemeanor for endangering the welfare of a child. Defendant argued that the People should be barred from questioning him about "things from my past." He argued that he was young and had made mistakes. The court ruled that if defendant testified, he could be asked about the two 1999 felony convictions and the 2010 misdemeanor conviction, but not about the underlying facts or his parole status.
The court then told defendant that potential jurors would be brought into the courtroom to begin voir dire. Defendant asserted that he was not prepared and requested additional time. The court denied the request, reiterating that it had tried to explain to defendant the difficulty of self-representation. The court reminded defendant that counsel was ready and able and willing to represent defendant. Defendant rebuffed the court's suggestion stating that counsel did nothing but urge him to plead guilty in return for a sentence of seven or eight years. When, during voir dire, the court denied defendant's for-cause challenge to a panelist, defendant declared that he did not "want to continue with this trial," and attempted to leave the courtroom. Defendant left the courtroom. A few minutes later, a court officer reported that defendant refused to return to court and did not want to be present for the duration of the trial.
The next day, May 16, 2014, defendant, after having met with counsel, apologized to the court for disrupting the proceedings, and stated that he again wished to proceed pro se. The case was adjourned to May 19, 2014. Due to an accident involving the Department of Correction bus on which defendant was a passenger, defendant was brought to the hospital and unable to appear in court. Defendant refused to come to court on May 20, 2014. When he appeared in court on [*3]May 22, 2014, defendant stated that he continued to experience pain in his back. The court allowed defendant to continue to represent himself, but warned him that if there were any further disruptions they would proceed in his absence. At this point in the proceedings, defendant asked if he could plead guilty in exchange for a sentence of five years. The People refused to consent to such a plea. The court told defendant that upon a plea of guilty, he would sentence defendant to seven years incarceration. Defendant refused.
On June 18, 2014, when trial was scheduled to begin, defendant reported that he was still "getting therapy" for his back. The court adjourned the case to July 30, 2014, after telling defendant that a trial date would be set after defendant was physically fit. On July 30, 2014, defendant stated that he would be ready to begin trial on September 3, 2014.
On September 3, 2014, defendant stated that he wanted to submit a 30.30 motion. The court informed him that he could submit the motion at any time. On September 18, 2014, defendant requested a reduction in bail and the court scheduled a bail application on October 14, 2014. On that date, the court again urged defendant to allow counsel "to give you advice while sitting at the table with you." Defendant maintained that he would defend himself, that "the lawyers are not helping me," and that he did not want counsel next to him or giving him advice. At that time, counsel filed a speedy trial motion "to dismiss or release" that defendant had written pro se, as well as his own affirmation in support of the motion. The court denied the motion in a written decision dated October 20, 2014.
On October 20, 2014, defendant stated that he was "not ready for trial," and asked for another month to "read all the papers." It was noted that all Rosario material had been turned over to defendant on May 15, 2014, and the court recalled that on July 30, 2014, defendant had said he could be ready for trial on September 3, 2014. Defendant insisted that he was not ready for trial. The court acknowledged that it was very difficult to prepare for trial while in custody and representing oneself without a lawyer. However, the court concluded that defendant had five months since the trial last started, and 2 ½ months since defendant's injury, to be ready for trial.
Defendant accused the court of not being "just and fair," and declared that "[i]f you continue to trial, you can do so by yourself, and then it will be on papers that I am not refusing to come to trial, but I am not ready." The court explained that if defendant decided not to be present the trial would proceed in his absence. Defendant said, "I'm sorry, but I am leaving" and insisted, "[i]t is illegal to start without me." Defendant left the courtroom, telling the court, "I'm not coming so [do not] call me to court anymore."
The trial continued in defendant's absence with counsel representing him. In the middle of jury selection, defendant returned to the courtroom and stated that he wanted to represent himself. The court denied defendant's request stating that defendant had demonstrated that he could not abide by the court's rulings. Defendant stated that he would remain, select a jury himself and question the witnesses himself. Defendant was removed from the courtroom. Counsel asked the court to reconsider and to allow defendant to represent himself. The court declined to do so and the trial proceeded in defendant's absence.
Defendant argues that his waiver of his right to counsel at the suppression and Sandoval hearings was not knowingly, voluntarily, and intelligently made.
Clearly, a criminal defendant has a constitutional right to represent himself. Even where the accused may in fact be harming himself by insisting upon conducting his own defense, deference should be made to his individual autonomy and desire to represent himself (People v McIntyre, 36 NY2d 10 [1974]; United States ex rel. Maldonaldo v Denno, 348 F2d 12 [2d Circuit 1965], cert denied sub nom. DiBlasi v McMann, 384 US 1007 [1966]). The right must be honored provided the defendant makes an unequivocal request, knowingly waives the right to counsel and has not engaged in conduct which would interfere with a fair and orderly proceeding (see e.g. People v Arroyo, 98 NY2d 101 [2002]; People v Smith 92 NY2d 516 [1998]).
As stated in McIntyre, "the right to defend pro se is ironic and perhaps enigmatic" (McIntyre, 36 NY2d at 14). "The
multifaceted problems generated by a motion to proceed pro se" is a difficult task for the trial court (id.). Here the court was faced with a defendant who was adamant in representing himself. Defendant rebuffed all attempts by the court to abandon his stated wishes to represent himself. It was clear that if defendant were not allowed to proceed pro se there was the danger of the trial not proceeding and/or defendant disrupting the proceedings. Indeed, later in the proceedings, after defendant disrupted the proceedings and the court denied defendant's fourth request to proceed pro se, defendant had to be removed from the courtroom.
Defendant argues that the court failed to meet its obligation to engage in a "searching inquiry" to ensure that a defendant is "aware of the dangers and disadvantages of proceeding without counsel" (People v Crampe, 17 NY3d 469, 481 [2011], cert denied sub nom. New York v Wingate, 565 US 1261 [2012]; see also People v Cole, 120 AD3d 72 [1st Dept 2014], lv denied 24 NY3d 1082 [2014]). There is no mandatory catechism for the searching inquiry the court is required to engage in, and the court need not follow any particular formula (People v Providence, 2 NY3d 579, 580, 583 [2004]). The inquiry is adequate if it "accomplish[es] the goals of adequately warning a defendant of the risks inherent in proceeding pro se, and apprising a defendant of the singular importance of the lawyer" (Arroyo, 98 NY2d at 104). In determining the validity of a waiver, a court is not limited to examining the colloquy immediately preceding the waiver, but may consider the record as a whole (see Providence, 2 NY3d at 581). Further, "a searching inquiry encompasses consideration of a defendant's pedigree since such factors as age, level of education, occupation and previous exposure to the legal system may bear on a waiver's validity'" (Cole, 120 AD3d at 75, quoting Crampe, 17 NY3d at 482).
According to defendant, the court's inquiry was insufficient to ensure defendant's understanding with regard to two broad categories of information: (1) the nature of the charges against defendant and his sentencing exposure; and (2) the pitfalls of self-representation and the benefits of counsel.
The court's colloquy was consistent with the New York Model Colloquies, Waiver of Counsel. Defendant was made aware of the risks inherent in proceeding pro se and was apprised of the singular importance of the lawyer in the adversarial system of adjudication (Arroyo, 98 NY2d at 104). The court drew defendant's attention to numerous tasks for which he would be responsible, if he proceeded pro se — jury selection, opening statement, questioning of witnesses, and summation. With regard to jury selection, the court specified some of the specialized knowledge defendant would require. The court advised defendant that he was susceptible to making bad decisions both because of "emotion" that would result from being personally involved in the case and because of "lack of legal training." Indeed, the inquiry here, was far more substantial than the inquiry that this Court found lacking in Cole, where the trial court "gave nothing more than generalized warnings" and provided the defendant with only one example of the tasks he would have to perform if he represented himself at trial (Cole, 120 AD3d at 80). The record is clear that defendant had a clear understanding of the pitfalls of self-representation and the benefits of counsel.
The record is also clear that defendant was well aware of the nature of the charges against him. In his pro se motions, defendant stated that he was charged with the felony of burglary in the second degree. Defendant correctly cited the Penal Law section. Defendant also moved, pro se, to dismiss the indictment based upon legal insufficiency, indicating a knowledge of the crime as well as its elements.
What is unclear is whether prior to the waiver, defendant was aware of the sentencing parameters, specifically that he faced a minimum of 5 years and a maximum of 15 years. The People point to defendant's statements that counsel was persistent in his recommendation that he [*4]take the seven or eight years offered by the People. They also point to defendant's statement that he would enter a plea of guilty in exchange for five years incarceration. The People argue that these statements, both made after the waiver, by defendant, reflect defendant's understanding that he faced considerably more time in prison if he did not plead guilty. However, as defendant argues, even if this indicates that defendant was aware that he faced a term of incarceration longer than seven or eight years, it does not sufficiently demonstrate that defendant was aware of his actual sentencing exposure of 15 years. As this Court stated in Cole, "[t]he colloquy should also include [both] the nature of the charges and the range of allowable punishments" (Cole, 120 AD3d at 75). The court's failure to ensure that defendant was aware of his sentencing exposure mandates the conclusion that defendant's waiver of the right to counsel was invalid.
Defendant asserts that a finding that his right to counsel was violated at the suppression and Sandoval hearings, requires remand for new hearings [FN3]. Defendant also argues that he is independently entitled to outright reversal of his conviction based on rulings made by the court.
"When a defendant has wrongly been denied counsel at a particular proceeding, [a reviewing court] do[es] not inquire whether the presence of counsel would have changed that proceeding's result," but rather assumes that the defendant would have prevailed at the proceeding (People v Wardlaw, 6 NY3d 556, 559, 560 [2006]). "But the remedy to which a defendant is entitled ordinarily depends on what impact, if any, the tainted proceeding had on the case as a whole. Where it had none, the conviction will be affirmed notwithstanding the error . . ." (id. at 559). In Wardlaw, the defendant was charged with the rape of his nine-year-old niece. The morning after the alleged rape, the defendant voluntarily went to the police precinct and made various inculpatory statements. At the Huntley hearing, the defendant's motion to dismiss his attorney and proceed pro se was granted. Following the hearing, where the defendant represented himself, his motion to suppress his statements was denied. The defendant proceeded to trial with representation of counsel and was convicted. In affirming the conviction, the Court of Appeals held that the deprivation of counsel at the Huntley hearing was harmless in light of the "truly overwhelming" evidence of the defendant's guilt (id. at 560). The Court pointed to the victim's testimony, the testimony of her brother and mother, who testified that she reported the assault immediately; a nurse and a doctor, who testified as to her physical condition when they examined her the next day and the presence of semen in her vagina and anus; and a DNA expert, who testified that the semen was that of the defendant.
The "normal remedy for a violation of the right to counsel at a suppression hearing is a new suppression hearing, with a new trial to follow if, after the new hearing, the evidence is suppressed" (id. at 559). However, a new hearing would serve no purpose, and need not be ordered, where it is clear beyond a reasonable doubt that the result at a new trial would be the same even if the defendant prevailed at the suppression hearing.
As noted by the trial court in its decision on the suppression motion, the statement allegedly made by defendant to the arresting officer that he worked for the super was clearly not the product of any custodial interrogation but rather was a response to an investigative inquiry. Further, neither the piggy bank nor the iPad were recovered from defendant by law enforcement officers. The record is uncontroverted that defendant returned the piggy bank to Lopez's husband and a tenant of the apartment grabbed the iPad as defendant attempted to discard it.
Even assuming counsel would some how be successful in arguing for the suppression of statements and property recovered, the evidence of defendant's guilt was overwhelming. [*5]Defendant was caught red-handed. Lopez encountered defendant — a person she did not know and did not allow into her home — in her bedroom. Defendant was observed wearing latex gloves by Lopez and P.O. Corchado. He was also observed to be in possession of Lopez's piggy bank.
Similarly, even assuming counsel would have been able to secure a more favorable Sandoval ruling, and defendant would have testified on his own behalf, the evidence overwhelmingly proved defendant knowingly and unlawfully entered the Lopez apartment with the intent to take property.
Defendant's argument that the court committed reversible error by denying his request for a one-month adjournment on October 20, 2014 is without merit. The adjournment was requested by defendant based upon his stated inability to review Rosario material. In denying defendant's request, the court took into consideration that the materials were not particularly voluminous and that defendant had been in possession of the documents for five months. Given this, we find there was no abuse of discretion in denying the adjournment (see People v Singleton, 41 NY2d 402, 405-406 [1977]).
Defendant also argues that the court erred in denying his motion for a mistrial based on the court's instruction regarding defendant's absence from the courtroom. Defendant contends that the court's failure to follow the pattern jury instruction on
"Absent Defendant" was prejudicial. In its instruction the court stated that defendant "decided" to "exercise" his right to be absent, and had "reasons for his decision." The pattern charge states "a defendant has the right to be present and the right not to be present," and then directs the jury not to draw any inference from the defendant's absence. According to defendant, the language employed by the court unduly emphasized that defendant chose to absent himself, and thereby "sen[t] the prejudicial message that defendant fled the jurisdiction, or declined to participate because he knew he was guilty." Contrary to defendant's assertions, nothing in the formulation used by the court, as compared to the pattern charge, suggested that defendant absconded. Arguably, it inured to defendant in dispelling any notion that he was excluded from the courtroom by the court. Indeed, in response to the motion for a mistrial, the court stated that it had told the jury that defendant chose not to attend the trial precisely to avoid giving the jurors the impression that defendant had absconded.
While such "choice" language is inappropriate where the exceptional circumstance of a defendant who first appears and later absents himself is not involved, any error here was harmless (see e.g. People v Wilson, 138 AD3d 637 [1st Dept 2016], lv denied 28 NY3d 939 [2016]; People v Brisbane, 205 AD2d 358 [1st Dept 1994], lv denied 84 NY2d 933 [1994]). There is no reasonable basis for concluding that the verdict would have been different if the court had followed the pattern charge. After giving the initial absence charge that resulted in the mistrial motion, the court twice gave the jury instructions regarding absence that were consistent with the pattern charge and included no language related to defendant's exercising his right, choosing, or deciding to be absent. Further, as stated previously, the evidence of defendant's guilt was overwhelming.
Defendant's argument that the People committed misconduct in summation by "misstat[ing] the elements of the charged crime" and "constructively amend[ing] [the prosecution's] trial theory" is unpreserved and we decline to review it in the interest of justice. Counsel's unelaborated objections were inadequate to make his position known to the trial court (see People v Vega, 238 AD2d 278 [1st Dept 1997], lv denied 90 NY2d 911 [1997]). As an alternative holding, we find it unavailing. The record reflects that the People in their summation accurately stated the statutory definition of building, under which unlawful entry into a part of a building with the requisite intent constitutes burglary even if defendant entered the building as a whole with license or without the intent to commit a crime (see People v Smith, 144 AD2d 600 [*6][2d Dept 1988]).
We find no compelling reason for reducing defendant's sentence in the interest of justice. We have considered and rejected defendant's additional arguments.
Accordingly, the judgment of the Supreme Court, New York County (Maxwell Wiley, J.), rendered December 18, 2014, convicting defendant, after a jury trial, of burglary in the second degree, and sentencing him, as a second violent felony offender, to a term of incarceration of 14 years and 5 years post release supervision, should be affirmed.
All concur.
Judgment, Supreme Court, New York County (Maxwell Wiley, J.), rendered December 18, 2014, affirmed.
Opinion by Webber, J. All concur.
Richter, J.P., Webber, Kern, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 2, 2018
CLERK



Footnotes

Footnote 1:The building was part of the Trespass Affidavit Program which authorized the police to enter.

Footnote 2:The People stated that they would not seek to introduce defendant's precinct statement on their direct case.

Footnote 3: It is unclear why defendant refers to pretrial hearings regarding the admissibility of a precinct statement, as this statement was adjudicated as a part of the suppression hearings.